IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JASON AUS, JANIS AUS, and the ESTATE of JEREMY AUS,<br><br>                     Plaintiffs,<br><br>v.<br><br>SALT LAKE COUNTY, JAMES WINDER, ROSIE RIVERA, WELLCON, INC., and John and Jane Does 1-10,<br><br>                 Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:16-cv-0266<br><br>District Judge Jill N. Parrish |

## I.      BACKGROUND

On the evening of November 16, 2013, ten days after being processed into the Salt Lake County Jail (the "Jail"), Jeremy Aus experienced multiple seizures and died in his bed. This action followed, brought by Mr. Aus' estate; his mother, Janis Aus; and his brother, Jason Aus. The operative second amended complaint asserts two causes of action: (1) a civil rights claim under 42 U.S.C. § 1983 against Salt Lake County (the "County"), the County's then-Sheriff, James Winder (in his individual and official[1] capacities), and Wellcon, Inc. ("Wellcon"), a private corporation that contracts with the County to provide healthcare practitioners for

---

[1] After this suit was initiated, Mr. Winder was replaced as Salt Lake County Sheriff by Rosie Rivera. The parties have failed to take account of Rule 25(d), which declares that "when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. . . . [t]he officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). Thus, Ms. Rivera is the appropriate public officer against whom to maintain plaintiffs' official capacity suit. Plaintiffs' individual capacity suit against Mr. Winder is unaffected by his departure from office.

purposes of delivering healthcare services to the Jail's inmate population; and (2) a state law medical malpractice claim against Wellcon.[2]

Before the court are five motions filed by defendants: (1) a motion for summary judgment on plaintiffs' § 1983 claim filed by the County, Mr. Winder, Ms. Rivera, and Wellcon (collectively, the "§ 1983 Defendants"); (2) a motion in limine filed by the § 1983 Defendants; (3) a motion in limine and motion for summary judgment on plaintiffs' medical malpractice claim filed by Wellcon; (4) a motion to strike certain exhibits appended to plaintiffs' opposition to the § 1983 Defendants' motion for summary judgment filed by the § 1983 Defendants; and (5) a motion to strike an affidavit appended to plaintiffs' opposition to Wellcon's motion in limine filed by Wellcon.

## A. STATEMENT OF FACTS[3]

### 1. Jeremy Aus' Arrest and Processing into the Jail

Jeremy Aus was arrested on November 6, 2013 after a physical altercation between Mr. Aus and his brother—both intoxicated—in which Mr. Aus apparently inflicted knife and/or sword wounds on his brother. Mr. Aus was charged with aggravated assault, and processed into the Jail. As is the Jail's practice at booking, he underwent a comprehensive nurse examination. As part of that procedure, Mr. Aus was asked to list his current prescription medications. He reported that he was prescribed klonopin[4] for anxiety, atenolol and triamterene for hypertension

---

[2] The Salt Lake County District Attorney's office represents all defendants in connection with the § 1983 claim. Wellcon has retained separate counsel to defend plaintiffs' medical malpractice claim.

[3] The court recites the record facts most favorable to plaintiffs as non-movants, resolving all factual disputes and drawing all reasonable inferences in their favor.

[4] Klonopin is the brand name for clonazepam, a long-acting benzodiazepine that has a 30-40-hour half-life (the period of time it takes to reduce the amount of a substance in an individual's body by half). Among other conditions, benzodiazepines are used to treat anxiety and panic disorders.

(high blood pressure), and the muscle relaxer tizanidine for back pain. Jail staff subsequently verified these prescriptions with Mr. Aus' pharmacy.

The Jail's practice is to route an inmate's verified prescriptions to two different prescribers to determine whether they should be ordered while the inmate is detained at the Jail. Those prescriptions deemed medical are presented to a medical doctor for review, and those prescriptions deemed mental health are presented to a mental health practitioner. Pursuant to that policy, Mr. Aus' hypertension medications were presented to and orally ordered by a medical doctor. Mr. Aus' klonopin prescription was emailed to a mental health prescriber, Paula Braun, an Advanced Practice Registered Nurse ("APRN"). It is unclear whether Ms. Braun knew, at that time, that Mr. Aus had been prescribed klonopin for nearly ten years;[5] she never saw or spoke to him. From the email she received, however, she knew that Mr. Aus was prescribed 2-milligrams of klonopin to be taken twice daily for a total of 4-milligrams per day, an uncommonly high dosage. The email also notified Ms. Braun that the nursing staff had instituted blood pressure checks, as well as an order to measure—twice-daily for five days—Mr. Aus' score on the Clinical Institute Withdrawal Assessment for Alcohol ("CIWA") scale. The CIWA scale, as its name suggests, detects alcohol withdrawal symptoms and provides a tool—in the form of an aggregate score—to guide the medical treatment of a patient detoxifying from an alcohol use disorder. Ms. Braun declined to order the klonopin prescription, and she placed no order to taper (the process of weaning a patient off of a substance on which they are dependent by gradual

_____

[5] The email she received contained a "Patient Problem List" detailing Mr. Aus' conditions observed during his two previous periods of incarceration at the Jail. Included among those patient problems was undifferentiated drug withdrawal syndrome and alcohol withdrawal.

reductions in dosage) the klonopin or any other benzodiazepine. Instead, Ms. Braun ordered that Mr. Aus be permitted to request mental health consultation on an as-needed basis.[6]

## 2. Benzodiazepine Withdrawal Syndrome

A patient can develop a physiological dependence on benzodiazepines in as little as 3-4 weeks of continuous use of a low dose. After a dependent patient substantially decreases or ceases the use of benzodiazepines entirely, they will experience withdrawal syndrome.

> This withdrawal syndrome is characterized by two or more symptoms . . . that include autonomic hyperactivity (e.g., increases in heart rate, respiratory rate, blood pressure, or body temperature, along with sweating); a tremor of the hands; insomnia; nausea, sometimes accompanied by vomiting; anxiety; and psychomotor agitation. A grand mal seizure may occur in perhaps as many as 20%-30% of individuals undergoing untreated withdrawal from these substances. . . . The withdrawal syndrome produced . . . may be characterized by the development of a delirium that can be life-threatening.

Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-V") (ECF No. 101-8 at 4, 5). The severity of benzodiazepine withdrawal syndrome depends on the doses consumed and the length of time the substance has been taken. "Doses of approximately 40mg of diazepam (or its equivalent) daily are more likely to produce clinically relevant withdrawal symptoms, and even higher doses (e.g., 100mg of diazepam) are more likely to be followed by withdrawal seizures or delirium." *Id.* "The longer the substance has been taken and the higher the dosages used, the more likely it is that there will be severe withdrawal." DSM-V (ECF No. 101-8 at 5). Mr. Aus was prescribed a daily clonazepam dose equivalent to 80 milligrams of diazepam (ECF No. 94-17 at 12), and had been taking clonazepam for nearly a decade.

---

[6] Ms. Braun's order read "mh kite prn," which meant that "he [was] welcome, at any point in his stay, to submit a [request] to the mental health service . . . saying any concerns he has, whether— you know, I can't sleep, I'm anxious, I'm really depressed or—I mean people say all kinds of things, but sometimes they're just asking to talk." It is unclear whether Mr. Aus would have been permitted to submit a mental health request absent Ms. Braun's order.

The onset and duration of benzodiazepine withdrawal syndrome is determined, in large part, by the half-life of the particular medication prescribed. "For substances with longer half-lives . . . symptoms may not develop for more than 1 week, peak in intensity during the second week, and decrease markedly during the third or fourth week." DSM-V (ECF No. 101-8 at 5).

There is no widely accepted, validated detection scale for benzodiazepine withdrawal. But "[b]ecause of the high risk of delirium, seizures, and death, benzodiazepine withdrawal should always be treated." (ECF No. 101-10 at 15). "A taper is necessary for safe and successful [benzodiazepine] discontinuation. Weaning from benzodiazepines should be done systematically with a full appreciation of the potentially-fatal consequences of abrupt cessation." (ECF No. 94-17 at 12).

> The tapering schedule will depend on several factors, including the setting in which the inmate is treated and the presence of co-morbid medical or psychiatric conditions. If the inmate is hospitalized, the medication can be tapered by 10% per day. Throughout the tapering schedule, inpatients should continue to be evaluated for withdrawal symptoms every 8 hours. Outpatients should not be tapered any more rapidly than by 10% every three to five days, or 25% per week.

(ECF No. 101-10 at 17).

Treatment of benzodiazepine withdrawal with beta-blockers (like the atenolol Mr. Aus was prescribed for hypertension both before and during his time at the Jail) is "not routinely recommended. . . . [because t]hey mask the very symptoms that signal an inadequate dosage of the [tapered benzodiazepine], and thereby place the inmate at increased risk for developing severe withdrawal. If the inmate is already on one of these medications for other medical conditions, such as hypertension, increased vigilance is necessary to prevent severe withdrawal symptoms from developing." (ECF No. 101-10 at 17).

"Detoxification and withdrawal are best managed by a physician or other medical professional with appropriate training and experience. As a precaution, severe withdrawal syndromes must never be managed outside of a hospital." (ECF No. 101-16 at 3).

### 3. Mr. Aus' Incarceration and Death

On his second full day in the Jail, November 8, 2013, Mr. Aus submitted a sick call request form, complaining that he was "supposed to be on [klonopin] 2mg twice a day." (ECF No. 101-7). The following day, a triage nurse assigned to handle the request met with Mr. Aus. He informed her that he had been prescribed klonopin for ten years and that he had not received any since arriving at the Jail two days prior. The triage nurse "educated" Mr. Aus that "klonopin is generally not given here," and left him with a worksheet entitled "Tips for Coping with Anxiety."

On November 10, 2013, Jail staff concluded the five-day CIWA and blood pressure monitoring orders entered during Mr. Aus' admission process. On November 13, 2013, Mr. Aus submitted yet another sick call request form, complaining that he was experiencing "all the symptoms on the paper I received." The following day, a triage nurse again met with Mr. Aus, who informed her that he had only slept for three hours the night prior. The nurse again "educated [Mr. Aus] that klonopin is generally not given here." (ECF No. 101-7 at 3).

Just before 8:00 pm on November 16, 2013, Officer William Lawrence spoke with Mr. Aus and his cellmate Justin Bane. Mr. Aus indicated that he had not eaten anything that day, and told Officer Lawrence that he did not feel well. Mr. Bane informed Officer Lawrence that Mr. Aus was not receiving the anxiety medication that he had been taking before coming to the Jail. As Officer Lawrence recounted, "[a]s I am talking to him he appears to be having seizures or muscle spasms and has three while I am talking to him." (ECF No. 101-2 at 15).

Roughly seven minutes later, Officer Lawrence called medical staff to Mr. Aus' cell after observing Mr. Aus seizing, drooling, and being held by his cellmate. A nurse arrived and attempted to ask Mr. Aus questions, but elicited no verbal response. Another officer present during this interaction later remarked that Mr. Aus' eyes "appeared to be rolled back and glossy." After the nurse administered smelling salts Mr. Aus reacted and then rolled over onto his side. The nurse concluded that no further action was necessary after finding that Mr. Aus' vitals were normal; the nurse cleared him to remain in his cell.

Officer Lawrence, apparently still concerned about what he had observed, called a mental health therapist to examine Mr. Aus. A therapist arrived and again attempted, unsuccessfully, to elicit a verbal response from Mr. Aus. "He just had the same blank stare on his face from when the nurse was in the unit," Officer Lawrence recalled. The therapist left and took action to have a mental health practitioner follow-up in the morning because "[the patient] was asleep."

Around 10:00 pm, Mr. Bane used the intercom in his cell to inform Jail staff that Mr. Aus was not breathing and that he could not find a pulse. Multiple officers responded and performed CPR on Mr. Aus. Shortly after being loaded into an ambulance, he was declared deceased.

Dr. Grey, the state medical examiner who conducted Mr. Aus' autopsy, concluded that Mr. Aus died from acute hydrocephalus (blockage of normal circulation of cerebrospinal fluid in the brain) arising from a cavum vergae cyst (a congenital fluid filled cyst in the ventricular system of the brain). An autopsy is not capable of revealing the existence of severe benzodiazepine withdrawal syndrome. Dr. Grey could not recall whether he reviewed the Jail's medical records during the course of the cause of death investigation. It is unclear whether the records, even if Dr. Grey reviewed them, would have revealed that the Jail had abruptly

discontinued Mr. Aus' ten-year, 4mg/day klonopin regimen ten days prior to his seizures and death.

## II. THE § 1983 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The § 1983 Defendants move for summary judgment, arguing (1) that they are entitled to qualified immunity; and (2) that plaintiffs have failed to establish the elements necessary to obtain municipal liability. After setting forth the summary judgment standard, the court addresses each argument in turn.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). To do so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When the nonmoving party bears the burden of proof at trial on a dispositive issue, that party must "go beyond the pleadings" and designate specific facts so as to "make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Liberty Lobby, Inc.*, 477 U.S. at 249. On summary judgment, "courts are required to view the facts and draw reasonable inferences" in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## A. QUALIFIED IMMUNITY

"Qualified immunity protects government officials from suit [in their individual capacity] for civil damages if their conduct does not violate clearly established statutory or constitutional rights." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016) (citing *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014)). "When a defendant raises a qualified immunity defense, the court must dismiss the action unless the plaintiff shows that (1) the defendant violated a statutory or constitutional right, and (2) the right was clearly established at the time of the violation." *Id.* Thus, once a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to make the requisite showing to defeat it.

The parties' briefing on qualified immunity contains erroneous statements of law, factual errors, and overlooks potentially dispositive issues. First, defendants[7]—Mr. Winder, Ms. Rivera, Salt Lake County, and Wellcon[8]—assert that they are entitled to qualified immunity. But as a municipality, the County is not entitled to any sort of immunity from § 1983 liability. *See Owen v. City of Independence, Mo.*, 445 U.S. 622, 638 (1980) ("[T]here is no tradition of immunity for municipal corporations, and neither history nor policy supports a construction of § 1983 that would justify [extending] qualified immunity [to municipalities]."). Thus, the County's qualified immunity defense fails at the outset.

---

[7] Throughout their papers, the parties offer imprecise legal arguments that refer collectively to "defendants." As explained in this memorandum decision, however, each defendant stands in very different shoes vis-à-vis § 1983 liability. To avoid reproducing the conceptual confusion engendered by the parties' references to the collective "defendants," the court refers to the appropriate defendant or defendants when analyzing the standards to which they are subject.

[8] Wellcon concedes that it acts under color of state law for purposes of § 1983. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982) ("If the challenged conduct of [private actors] constitutes state action . . . then that conduct [is] also action under color of state law and will support a suit under § 1983.").

Second, despite the fact that plaintiffs' complaint asserts a § 1983 claim against Mr. Winder "in both his official and individual capacity"—the latter of which would entitle him to raise a qualified immunity defense—plaintiffs now unambiguously represent that they "have not sued an individual officer," and that, as a result, "[q]ualified immunity . . . need not be addressed." (ECF No. 101 at 35). This is highly confusing, and it remains unclear whether plaintiffs are unaware that they have in fact sued an individual officer, or whether they merely intend to now withdraw the individual-capacity claim. Regardless, in the face of Mr. Winder's qualified immunity defense, plaintiffs have made no attempt to carry their burden to show that Mr. Winder violated a clearly established statutory or constitutional right. *See Mayfield*, 826 F.3d at 1255 ("When a defendant raises a qualified immunity defense, the court must dismiss the action unless the plaintiff shows that (1) the defendant violated a statutory or constitutional right, and (2) the right was clearly established at the time of the violation."). Because plaintiffs have not made the necessary showing to defeat Mr. Winder's qualified immunity defense, he is entitled to summary judgment.[9]

Finally, Wellcon, as a private corporate entity, bears the threshold burden of establishing that it is entitled to assert qualified immunity in the first place. The weight of authority extends the availability of the qualified immunity defense to private employees who are sued under § 1983.[10] *See Filarsky v. Delia*, 566 U.S. 377, 389 (2012) ("[I]mmunity under § 1983 should not

---

[9] To the extent that an official-capacity claim remains pending against Ms. Rivera—Mr. Winder's successor—that claim is duplicative of the claim against the County because a suit against a person in his or her official capacity is no more than a suit against the official's employer. *See Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998).

[10] The Supreme Court once held that employees of a wholly-private prison may not avail themselves of the qualified immunity defense. *See Richardson v. McKnight*, 521 U.S. 399, 410–11 (1997). Since that decision, however, the Court has gone to great lengths to confine that case to its facts, characterizing *Richardson* as having held only that "prison guards employed by a private company and working in a privately run prison facility did not enjoy [qualified

vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis."). But whether a private corporate entity can assert qualified immunity is a much more difficult question that has not been addressed by the Supreme Court. And while the Tenth Circuit has held "that there is no bar against a private corporation claiming qualified immunity[,]" whether or not a private corporation is extended qualified immunity under that court's precedent turns on the entity's ability to establish that the policies underlying qualified immunity are implicated by § 1983 suits against it.[11] *See Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc.*, 413 F.3d 1163, 1166 (10th Cir. 2005). Because Wellcon missed this issue entirely, the court is without the facts and arguments necessary to determine whether Wellcon is entitled to assert qualified immunity and force plaintiffs to make their two-part showing to defeat the defense. As a result, Wellcon is not entitled to summary judgment on grounds of qualified immunity.

In sum, while Mr. Winder is entitled to summary judgment on qualified immunity grounds, the qualified immunity defense is not available to the County, and Wellcon has failed to establish that it may assert qualified immunity in the first instance.

---

immunity]." *Filarsky v. Delia*, 566 U.S. 377, 393 (2012) ("*Richardson* was a self-consciously 'narrow[]' decision." (alteration in original)).

[11] More recently, the Tenth Circuit articulated the circumstances in which a private entity may assert qualified immunity as follows:

> First, if the private parties are "closely supervised by the government." *Rosewood Servs., Inc. v. Sunflower Diversified Servs., Inc*., 413 F.3d 1163, 1167 (10th Cir. 2005); *see also DeVargas v. Mason & Hanger–Silas Mason Co.*, 844 F.2d 714, 722 (10th Cir. 1988). Second, if there is a historical basis for providing immunity to that type of private entity. *Richardson v. McKnight*, 521 U.S. 399, 404, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997). Third, if extending immunity implicates "special policy concerns involved in suing government officials." *Wyatt*, 504 U.S. at 167, 112 S.Ct. 1827.

*Gen. Steel Domestic Sales, L.L.C. v. Chumley*, 840 F.3d 1178, 1182 (10th Cir. 2016).

## B. *MONELL* LIABILITY FOR VIOLATIONS OF THE EIGHTH AND FOURTEENTH AMENDMENTS

The Supreme Court holds that municipalities are "persons" who may be sued under § 1983. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). But "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be liable under § 1983 on a *respondeat superior* theory." *Id.* at 691. It is the Court's rejection of *respondeat superior* municipal liability that animates the unique requirements of so-called *Monell* liability. The Tenth Circuit has distilled the relevant case law into a three-element framework: to recover in a § 1983 action against a municipality, a plaintiff must establish "(1) [an] official policy or custom, (2) causation, and (3) state of mind." *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

In the Tenth Circuit, the municipal liability principles announced by *Monell* and its progeny apply equally to a private entity sued under § 1983. *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003). Thus, whether the actionable conduct is that of the County or Wellcon (collectively, the "Entity Defendants"), plaintiffs must adduce (1) a policy or custom fairly attributable to the Entity Defendants; that (2) was the moving force behind Mr. Aus' death; and (3) was instituted or maintained with deliberate indifference as to its known or obvious consequences. *See Schneider*, 717 F.3d at 770–71. The court addresses each element in turn.

### 1. Policy or Custom

"[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Thus, "[t]he 'official policy' requirement [is] intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and

thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Id.* at 479.

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused." *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir.2010) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) and *City of Canton v. Harris*, 489 U.S. 378, 388–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)) (internal quotation marks omitted).

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (alteration in original).

Plaintiffs' municipal liability arguments are confusing, often combining statements of law from several of these paths to establishing municipal liability. In their clearest articulation of their theory, however, plaintiffs argue that (1) "Defendants have a formal regulation (or at least a widespread practice) of depriving inmates of their verified benzodiazepine prescriptions"; and that (2) "Defendants have failed to implement a benzodiazepine withdrawal protocol that monitors inmates during peak withdrawal." Thus, plaintiffs allege the existence of both an express formal policy as well as informal customs of action or inaction so widespread as to have the force of law.

Plaintiffs' formal policy theory fails because they have adduced no "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the Entity Defendants. *See Monell*, 436 U.S. at 690. The County's written policy[12] that most closely bears on plaintiffs' theory of municipal liability is actually contrary to what plaintiffs purport the County's policy to

---

[12] Wellcon does not have written policies.

be, declaring that: "Patients entering the facility on verified prescription medications continue to receive the medications in a timely fashion as prescribed; an acceptable alternative medication may be substituted as clinically indicated. The medications will be verified and communicated to the provider for disposition." (ECF No. 101-2 at 23). Thus, plaintiffs cannot establish an express policy of withholding verified benzodiazepine prescriptions from inmates.

The record is sufficient, however, to support a finding that the Entity Defendants have imposed several unwritten practices relevant to Mr. Aus' injury.[13] Some of these customs are borne out by their appearance throughout the record while the existence of others is confirmed by the testimony of Dr. Wilcox, Wellcon's founder and sole owner who "oversees the entirety of the prescriptive practice within the jail."[14]

First, every Wellcon or County employee deposed displayed awareness of a custom that, very generally, designates benzodiazepines as disfavored medications. Dr. Wilcox testified that benzodiazepines "are just not medically necessary to treat patients in a jail setting." (ECF No. 101-4 at 57). Ms. Braun testified that "[i]n general, controlled substances are not given or are tapered, and benzodiazepines are a controlled substance." (ECF No. 101-5 at 45). Indeed, Mr. Aus himself was even informed of this custom during his time at the Jail. After twice complaining of anxiety and informing a triage nurse that he had been on a klonopin regimen for

_____

[13] Plaintiffs attempt to establish the existence of a custom by estimating the number of inmates denied their verified benzodiazepine prescriptions. But plaintiffs have not shown how a policy of denying patients their verified benzodiazepine prescriptions is itself unconstitutional. In other words, plaintiffs have not established that a failure to treat an inmate's anxiety disorder is a violation of the inmate's Eighth Amendment right to be free of cruel and unusual punishment. Rather, the relevant statistical analysis would be how many benzodiazepine-dependent patients—*i.e.*, patients for whom the cessation of benzodiazepines places them at risk of experiencing severe withdrawal symptoms—are not provided with adequate medical care for that condition. This information is not part of the summary judgment record.

[14] All quotes attributed to Dr. Wilcox herein were made in his capacity as Wellcon's Rule 30(b)(6) designee.

ten years, Mr. Aus was twice informed that "klonopin is generally not given here." (ECF No. 101-7 at 2, 3).

The Entity Defendants repeatedly attempt to portray the decision whether to continue, taper, or terminate a benzodiazepine prescription as being driven only by medical necessity; that each clinician exercises her clinical judgment on the basis of an individual patient's presentation. But no nurse or prescriber could provide any purely clinical rationale for the disfavored status of benzodiazepines, whether tapered or otherwise. When pressed about the reasons for the Jail's clinical aversion to benzodiazepines, Dr. Wilcox explained that "benzodiazepines are problematic medications in a custodial environment. . . . [because t]hey are frequently traded inmate to inmate, which can be very problematic." (ECF No. 101-4 at 71). Whether or not the policy is justified by the practical constraints of the custodial environment, it is clear that there exists an unwritten policy or custom at the Jail[15] that, at minimum, discourages the prescribing of benzodiazepines. In short, a formal policy vesting absolute clinical discretion in prescribers cannot vitiate a finding that the Entity Defendants have imposed clear customs discouraging the prescribing of benzodiazepines.

---

[15] It is difficult to affirmatively allocate the creation of the custom to either Wellcon or the County alone, especially when the avowed concerns underlying the discouragement of benzodiazepines—security and compliance—appear to be squarely within the province of the County. The § 1983 Defendants' briefing makes no attempt to distinguish between the practices allocable to Wellcon and those allocable to the County, presumably because the County appears to have assumed ultimate responsibility for any liability under the § 1983 claim. The record and oral arguments for these motions established the fact that an inmate's medical care at the Jail is handled by both Wellcon and County employees, and the distinction between these categories of employees is virtually imperceptible. For example, some of the Jail's mental health practitioners are Wellcon employees and others work directly for the County. Ms. Braun worked for Wellcon at the time of the events giving rise to this suit, but now works for the County in an identical capacity. Thus, in practice, the Entity Defendants must be said to have acted in concert and, at least with respect to the § 1983 claim, any uncertainty flowing from these undefined boundaries of authority cannot inure to the Entity Defendants' benefit.

But the custom that bears most directly on the alleged Eighth Amendment violation in this case is the inaction that resulted from the Entity Defendants' refusal to acknowledge the well-known dangers attendant to benzodiazepine withdrawal syndrome. Dr. Wilcox must be deemed Wellcon's final policymaker, and his clear expressions of unwritten policy are fairly attributable to Wellcon.[16] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the [entity] to § 1983 liability.").

There is more than sufficient evidence to establish that the Jail had determined that benzodiazepine withdrawal syndrome is non-lethal and non-medical. Strikingly, Dr. Wilcox confirmed the existence of this policy, declaring that "[w]e don't really consider benzodiazepines to be a lethal withdrawal syndrome." (ECF No. 101-4 at 58). He further testified that absent extraordinary circumstances in which the treatment of a physical malady requires benzodiazepines, all inmate issues involving that class of drugs—including benzodiazepine withdrawal syndrome—are handled by mental health practitioners to the exclusion of medical doctors. Moreover, it is uncontroverted that the Jail's sole course of treatment for benzodiazepine-dependent inmates is referral to mental health practitioners for a mental health

---

[16] The Tenth Circuit's extension of the principles of municipal liability to private entities presents difficulties in the final policymaker context because the Supreme Court holds that whether a municipal body or employee may be said to "speak with final policymaking authority" must be determined, as a matter of law, by reference to state and local positive law. *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989). This analysis is obviously inapposite when a plaintiff sues a private corporation rather than a municipality. Nevertheless, the rationale underlying this requirement is that when an individual is empowered by his employer to make policy, liability flowing from the policymaking acts of that individual are properly chargeable to the entity. Here, it appears beyond doubt that Dr. Wilcox—the sole member and founder of Wellcon, and the person who oversees the entire prescriptive practice of the Jail—is a final policymaker for Wellcon.

assessment. There is no established protocol—written or unwritten—regarding the monitoring or medical treatment of benzodiazepine withdrawal syndrome.

Further, as evidence that the Entity Defendants have selected "a course of action . . . from among various alternatives[,]" the Entity Defendants have a policy of instituting a withdrawal-monitoring regimen for opioid-dependent patients—a condition not generally considered to be life-threatening—while imposing no standard practice for benzodiazepine-dependent patients. *See Pembaur*, 475 U.S. at 483. Instead, Wellcon's policy is to refer patients who are dependent only on benzodiazepines—to the exclusion of alcohol and opioids—to the Jail's mental health practitioners, ostensibly because of Wellcon's position that benzodiazepine withdrawal is not a medical concern. (ECF No. 101-4 at 59 ("The benzodiazepine withdrawal patients are referred to . . . mental health clinicians for assessment.")). Thus, while opioid withdrawal and alcohol withdrawal are deemed medical issues by Wellcon that are suitable for treatment and/or monitoring by medical doctors, benzodiazepine withdrawal is considered to be a mental health issue. In short, the evidence establishes that (1) the Entity Defendants have withdrawal monitoring/treatment protocols for other substances—including substances that do not, on their own, produce life-threatening withdrawal symptoms—but have elected not to create the same for benzodiazepines; and (2) the Entity Defendants have a policy of treating benzodiazepine withdrawal syndrome as a mental health matter. Thus, the summary judgment record is sufficient to support the conclusion that the Entity Defendants have unwritten customs and practices with respect to benzodiazepine withdrawal that are fairly attributable to the Entity Defendants by virtue of (1) testimony establishing the existence of unwritten customs by Wellcon's final policymaker; and (2) evidence of the widespread nature of the customs.

## 2. Causation

Having identified customs attributable to the Entity Defendants, plaintiffs must establish that those customs were the "moving force" behind the deprivation of Mr. Aus' Eighth Amendment rights. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) ("[A] plaintiff . . . must demonstrate a direct causal link between the [entities'] action and the deprivation of federal rights.").

In cases where a policy or custom is itself unconstitutional—for example, when a city council, without due process, terminates a citizen's employment in which she had a protected property interest—the causation inquiry is simple. But when a plaintiff argues that a municipal policy or custom led to a constitutional injury, a plaintiff must present evidence from which a jury could conclude that the action or inaction has a causal link to the constitutional tort.

Here, there is sufficient evidence from which a jury could conclude that the customs identified above were the moving force behind Mr. Aus' Eighth Amendment deprivation. First, the jury could find that the custom of discouraging benzodiazepine prescriptions was the moving force behind Ms. Braun's decision to abruptly discontinue Mr. Aus' ten-year benzodiazepine regimen. Indeed, the degree to which that purported "clinical decision" deviates from the generally accepted treatment of long-term, high-dose, benzodiazepine-dependent patients—as established by both correctional and traditional medical authorities in the record—is itself good evidence that the Entity Defendants' unwritten policy disfavoring benzodiazepine prescriptions was the real driving force, especially when combined with Ms. Braun's testimony establishing her awareness of this policy. Moreover, this custom was known, and explicitly relied on, by the triage nurse who twice met with Mr. Aus in response to his requests for medication on his third and eighth days at the Jail.

The jury could further conclude that the Entity Defendants' custom of categorizing benzodiazepine withdrawal syndrome as a non-medical and non-lethal condition was the moving force behind their failure to order a medically necessary taper or adequately monitor Mr. Aus' withdrawal. The parties agree that there is no generally accepted, validated benzodiazepine withdrawal detection scale. But from that fact, at least one correctional healthcare guide—developed by the United States Bureau of Prisons—concludes that CIWA monitoring should never be used to detect benzodiazepine withdrawal symptoms, and that a taper is the only safe treatment method. But even without accepting that conclusion, it seems abundantly clear from the record that CIWA monitoring in general, and a five-day[17] CIWA monitoring order in particular, is calculated to detect symptoms from alcohol withdrawal, not benzodiazepine withdrawal. Thus, while the Entity Defendants repeatedly assert that Mr. Aus' CIWA scores never rose to a level that warranted medical intervention, the CIWA monitoring regimen was only ordered for five days, a period of time sufficient to detect physiological symptoms of alcohol withdrawal, but inadequate to detect issues related to Mr. Aus' withdrawal from clonazepam (which would have reached peak intensity at some point between 7 and 14 days after his last dose). (ECF Nos. 82 at 4, 101-5 at 25). From all of this evidence, the jury could conclude that the Entity Defendants' policy of treating benzodiazepine withdrawal syndrome as a non-lethal, non-medical issue led the nurse to order only five days of CIWA monitoring—a measurement tool and period of time adapted to detect alcohol withdrawal syndrome—when

---

[17] A five-day CIWA monitoring regimen appears throughout the record as the recommended length of monitoring for alcohol withdrawal syndrome. There is conflicting evidence in the record about whether nurses at the Jail ever institute a CIWA monitoring regimen order for a duration longer than five days, but APRN Braun, the prescriber who treated Mr. Aus, testified that "CIWAs . . . require nurses to physically assess [patients] two times a day, for five days." (ECF No. 101-5 at 32). Plaintiffs' expert, Dr. Merrill, testified that a patient reaches peak alcohol withdrawal 72 hours after the patient's last drink.

withdrawal from many benzodiazepines (and certainly from clonazepam) would be most acute after the five days had elapsed.

Additionally, the jury could permissibly conclude that this custom was the moving force behind Ms. Braun's failure to recognize that Mr. Aus' hypertension medication would mask his symptoms without ameliorating the risk of seizures and death. Stated differently, a jury could find that the Entity Defendants' insouciant approach to the serious medical risks attendant to severe benzodiazepine withdrawal—flatly inconsistent with the unanimity of medical authorities in the record—resulted in a failure to train the mental health practitioners that hypertension medications impede the detection of severe benzodiazepine withdrawal syndrome.[18] On the basis of this record, a jury would be empowered to infer that the detection and treatment failures were the natural consequence of the Entity Defendants' categorization of benzodiazepine withdrawal syndrome as a non-lethal, non-medical condition.

Finally, the jury could conclude that the customs above and the absence of any established protocol for benzodiazepine withdrawal syndrome—a clear policy choice in light of the Entity Defendants' promulgation of withdrawal protocols for alcohol and opioids—were the moving force behind the Jail's failure to identify the hallmark symptoms of severe benzodiazepine withdrawal the night Mr. Aus died. The jury could permissibly conclude that a benzodiazepine withdrawal protocol would have at least placed Jail staff on notice that Mr. Aus was at risk for severe benzodiazepine withdrawal symptoms, and that such awareness combined

---

[18] This fact further undermines the Entity Defendants' insistence that Mr. Aus did not experience anything more than mild withdrawal symptoms because the period of CIWA measurement combined with the obfuscating effects of Mr. Aus' hypertension medications essentially assured that the Entity Defendants would not learn of his severe physiological withdrawal symptoms until it was too late.

with his symptoms would have alerted them to the need to administer a rescue benzodiazepine dose to halt his rapidly deteriorating condition.

In sum, there is ample evidence in the summary judgment record from which the jury could conclude that the Entity Defendants' custom of discouraging benzodiazepine prescriptions and their policy that benzodiazepine withdrawal syndrome is a non-lethal, non-medical condition were the moving force behind Mr. Aus' constitutional deprivation. *See King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (finding that "the way two [municipal medical] policies interacted . . . caused [the municipality] to run afoul of the Constitution.").

Apart from whether the above policies were the moving force behind Mr. Aus' constitutional violation, the Entity Defendants further protest that there is insufficient evidence to support a jury's conclusion that Mr. Aus' benzodiazepine withdrawal was the cause of his death. But even if true, this evidentiary deficiency[19] alone would not entitle the Entity Defendants to summary judgment on plaintiffs' § 1983 claim because Mr. Aus' estate may recover damages for any pain and suffering he experienced prior to his death, and the record contains significant evidence that Mr. Aus experienced severe benzodiazepine withdrawal symptoms preceding his death.[20]

---

[19] The admissibility of Dr. Merrill's death causation opinion is addressed *infra* § III.A.

[20] The Entity Defendants' failure to measure Mr. Aus' CIWA scores during the period of peak withdrawal facilitates their argument that there are no medical records that corroborate Mr. Aus' serious withdrawal symptoms. But the record contains statements by multiple individuals who perceived Mr. Aus experiencing substantial discomfort. Moreover, a jury would be free to credit Dr. Merrill's opinion—bolstered by several independent sources in the record—that a patient abruptly discontinued from a ten-year, 4-milligram per day clonazepam prescription would have experienced severe withdrawal symptoms.

### 3. State of Mind

Finally, in the Tenth Circuit, to establish municipal liability for any constitutional violation,[21] plaintiffs "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Schneider*, 717 F.3d at 770 (quoting *Brown*, 520 U.S. at 407).

> The deliberate indifference standard[22] may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998) (internal citations omitted).

Importantly, the municipality must be deliberately indifferent to the particular constitutional violation alleged. Thus, because plaintiffs allege that the Entity Defendants violated Mr. Aus' Eighth Amendment[23] right to be free from cruel and unusual punishment, they

---

[21] "[T]he prevailing state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation." *Schneider*, 717 F.3d at 771 n.5.

[22] The parties repeatedly recite the deliberate indifference standard applicable to individual defendants sued for violations of the Eighth Amendment, which contains a subjective component requiring that the individual defendant possess actual awareness of a substantial risk of harm. The applicable standard for municipalities is the one set forth above, in part because of the "considerable conceptual difficulty [that] would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a government official." *See Farmer v. Brennan*, 511 U.S. 825, 841 (1994).

[23] Mr. Aus was confined in the Salt Lake County Jail from November 6, 2013 to November 11, 2013 as a pretrial detainee, a status that does not implicate the Eighth Amendment and instead avails an inmate of the protections provided by the Fourteenth Amendment's Due Process Clause. On November 12, 2013, Mr. Aus pled guilty to certain charges and was sentenced to 90 days in jail, at which point he became a convicted prisoner protected by the Eighth Amendment's

must identify conduct fairly attributable to the Entity Defendants that evinces "deliberate indifference to serious medical needs." *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).[24]

There is insufficient evidence in the record of a pattern of tortious conduct involving the consequences of the Entity Defendants' benzodiazepine customs to establish that they were on notice that their customs were resulting in constitutional violations. But the record evidence would support a jury's conclusion that the Eighth Amendment violation alleged here was "a highly predictable or plainly obvious consequence of [the Entity Defendants'] action or inaction." *Barney*, 143 F.3d at 1308 (internal quotations omitted).

At the broadest level, a jury could conclude that a failure to attend to the medical needs of inmates susceptible to severe benzodiazepine withdrawal syndrome is a highly predictable *and* plainly obvious consequence of the Entity Defendants' position that benzodiazepine withdrawal syndrome is a non-lethal condition that does not require medical care. It is highly predictable that a widespread practice of discouraging benzodiazepine prescriptions combined with a blasé approach to the uncontroverted life-threatening dangers of benzodiazepine withdrawal syndrome

---

proscription of cruel and unusual punishment. The parties apparently assume that for liability to lie under either amendment, plaintiffs must adduce conduct that amounts to deliberate indifference of a serious medical need—the standard developed in the Eighth Amendment context. The Supreme Court has provided little guidance on the differences, if any, in the protection afforded by the amendments vis-à-vis custodial medical care, but the Court has held that a pretrial detainee's due process rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). More recently, the Court held that the state-of-mind standards differ in the context of an excessive force claim. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). Ultimately, any potential state-of-mind differences between the amendments appear academic in an action against a municipality because the Tenth Circuit has concluded that the "state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation." *Schneider*, 717 F.3d at 771 n.5.

[24] The Eighth Amendment standard also requires a plaintiff to establish, as an objective matter, that an inmate's medical need was sufficiently serious to implicate the Eighth and Fourteenth Amendments. The Entity Defendants do not dispute, and the Tenth Circuit has held, that "death [is], without doubt, sufficiently serious to meet the objective component" of the Eighth and Fourteenth Amendment standards. *See Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

would lead to precisely what occurred here: a failure to (1) institute a medically necessary taper, and (2) appropriately monitor the inmate for severe withdrawal symptoms.

First, a jury would be free—and may even be compelled—to credit the vast, uncontroverted record evidence that benzodiazepine withdrawal syndrome is a serious, life-threatening condition. When combined with the Entity Defendants' classification of this syndrome as non-lethal and non-medical, the jury could find that they were deliberately indifferent to the known risks of benzodiazepine withdrawal syndrome.

Relying on DSM-V's explanation that "[f]or substances with longer half-lives . . . symptoms may not develop for more than 1 week [and] peak in intensity during the second week," the jury could conclude that the Entity Defendants' practice of ordering a 5-day CIWA monitoring regimen was deliberately indifferent to the serious medical needs of an inmate experiencing benzodiazepine withdrawal syndrome. And even had the Entity Defendants customarily ordered a 10-day CIWA monitoring regimen, thereby signaling at least a modicum of concern for benzodiazepine-dependent patients, there is record evidence suggesting that the CIWA scale has not been validated for the detection of benzodiazepine withdrawal syndrome, and that a taper is the only acceptable medical treatment. In fact, while the parties' evidence agrees that there is no validated detection system for benzodiazepine withdrawal, aside from defendants' own representations, there is no independent support for using CIWA scores to detect benzodiazepine withdrawal, and the Bureau of Prisons expressly warns against the practice of using the scale for that purpose.

Finally, from evidence that tends to establish that opioid withdrawal syndrome is "rarely dangerous except in medically debilitated individuals and pregnant women," but that "[b]ecause of the high risk of delirium, seizures, and death, benzodiazepine withdrawal should always be

treated," the jury may conclude that the Entity Defendants' medical protocol imposing monitoring for opioid withdrawal syndrome and their decision not to institute a similar protocol for benzodiazepine withdrawal syndrome amounts to deliberate indifference.

Whether or not plaintiffs could establish that the Entity Defendants were deliberately indifferent might be a different matter if there were some ambiguity or room for debate as to the risks of benzodiazepine withdrawal syndrome. In such a hypothetical, the Entity Defendants' indifferent approach to benzodiazepine withdrawal syndrome might amount to gross negligence. But against the unanimity[25] of authorities outlining the serious, potentially life-threatening consequences of untreated benzodiazepine withdrawal, a jury would be empowered to conclude that Mr. Aus' Eighth Amendment deprivation was a highly predictable and/or plainly obvious consequence of the Entity Defendants' customs. Stated simply, when an entity's custom is to treat an indisputably serious, life-threatening medical condition as though it is a benign medical condition, it cannot claim lack of awareness that severe medical consequences, including death, might result.[26]

In sum, the record contains sufficient evidence from which a jury could conclude that the Entity Defendants have instituted or maintained multiple customs, with deliberate indifference, that caused the deprivation of Jeremy Aus' constitutional rights. As a result, the § 1983 Defendants' motion for summary judgment must be denied.

---

[25] The only indication in the record that benzodiazepine withdrawal syndrome is not as described above comes from Dr. Wilcox.

[26] That the medication at issue poses other problems in the custodial environment does not change this analysis. While those concerns may well justify the Entity Defendants' policy of disallowing "chronic" benzodiazepine prescriptions in the Jail, it cannot justify the maintenance of widespread customs that cause medically-necessary tapers to be denied to benzodiazepine-dependent inmates in violation of the Eighth Amendment. And, of course, this concern does not bear at all on the Entity Defendants' failure to institute a monitoring protocol for benzodiazepine withdrawal.

## III. DEFENDANTS' MOTIONS TO EXCLUDE EXPERT OPINIONS AND TO STRIKE EXHIBITS

Wellcon is represented by counsel for the County in connection with plaintiffs' § 1983 claim, but is represented by separate counsel on the medical malpractice claim. Defendants apparently believed that this unique arrangement entitled them to file two substantially similar motions to exclude testimony offered by Dr. Merrill, each motion purporting to speak for Wellcon. While multiple motions for a single party flowing from this dual representation might be appropriate when the motions seek to resolve legal issues applicable to only one of the claims, the instant motions are not of this variety. Indeed, each of the motions purporting to speak for Wellcon seek exclusion of the same general testimony regarding standard of care and causation of Mr. Aus' death. To the extent that there are claim-specific issues with Dr. Merrill's testimony, defendants have ignored those distinctions entirely. For example, the § 1983 Defendants seek to exclude Dr. Merrill's opinion about the appropriate standard of care in a correctional facility, notwithstanding that whether they are liable under § 1983 will not at all depend on whether they have violated a standard of care. Because the court assumes that defendants' decision to file two substantially similar motions to exclude evidence represents an assertion that there are important, claim-specific differences between their arguments, the court will disregard arguments made by either motion that do not correspond to the legal standard applicable to the relevant claim.

### A. DR. MERRILL'S CAUSATION OPINION

The admissibility of Dr. Merrill's opinions related to the causal nexus between Mr. Aus' benzodiazepine withdrawal syndrome and his death—as expressed in his initial report, his deposition, and his affidavit submitted in connection with the instant motions for summary judgment—are the primary object of defendants' motions to strike and motions to exclude

testimony. As explained below, plaintiffs have not carried their burden to establish that Dr. Merrill's death causation opinion is reliable.

Rule 702 of the Federal Rules of Evidence provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Supreme Court has explained that Rule 702 creates a gatekeeping obligation for the district court, "assign[ing] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993).

The Supreme Court has articulated four non-exclusive inquiries that a district court might undertake in assessing the reliability of an expert's methodology: (1) whether the expert's theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has general acceptance. *Id.* at 593–94. Which, if any, of these considerations ought to be endeavored by a court is determined by their applicability to the expert testimony at issue.

Defendants do not dispute that Dr. Merrill's proposed testimony is relevant to the task at hand. Rather, they argue that he is not qualified to opine on the cause of Mr. Aus' death, and that his opinion on that matter is not reliable. In support, defendants advance three main arguments: First, that Dr. Merrill is not qualified by training or experience to opine on this particular causation question. Second, that Dr. Merrill's opinion has been shown to be unreliable by his

inconsistent testimony at his deposition. And third, that Dr. Merrill is unable to articulate the facts and data on which he bases his conclusion that Mr. Aus' benzodiazepine withdrawal seizures caused his death. After a careful review of all the materials that bear on this determination (Dr. Merrill's initial one-page report, his lengthy deposition, and his affidavit), the court agrees that Dr. Merrill's death causation opinion must be excluded.

The Tenth Circuit has explained that "merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001). From this general principle, defendants argue that an opinion as to the cause of Mr. Aus' death can only be offered by a pathologist or toxicologist who has completed a fellowship in those disciplines. The court cannot agree. Surely a psychiatrist or other medical doctor with sufficient experience and familiarity with the maladies Mr. Aus experienced here could be qualified to offer an opinion on the cause of his death. Dr. Merrill's problem is that, by his own admission, he does not have that experience, and his testimony regarding acute hydrocephalus, cavum vergae cysts, and the role those conditions played in Mr. Aus' death evinces that deficiency. Dr. Merrill has never treated a patient experiencing hydrocephalus, nor a patient diagnosed with a cavum vergae cyst. If Dr. Merrill were familiar with the literature on these conditions, perhaps this experiential deficit could be overcome. But in response to questions regarding those conditions, Dr. Merrill almost invariably qualified his answers with comments about his lack of expertise or unfamiliarity with the conditions. In response to a question about whether he had ever treated a patient with a cavum vergae cyst, Dr. Merrill remarked that "[i]t sounds familiar, but I can't recall the specifics of it, no."

Additionally, though he would subsequently contradict this testimony in more general terms, Dr. Merrill clearly testified that he was unable to opine that Mr. Aus' death—which he concedes was ultimately caused by the closure of Mr. Aus' cavum vergae cyst—was more likely than not caused by his severe benzodiazepine withdrawal, testifying as follows:

Q. Did the benzodiazepine withdrawal lead to the cyst closure?

A. Potentially.

Q. More likely than not?

A. More likely than not? No.

(ECF No. 107-1 at 129).

But even setting aside the issues with Dr. Merrill's qualifications and inconsistent testimony, the principal defect in Dr. Merrill's death causation opinion is his failure to provide— either in his initial report, his deposition testimony, or his affidavit—the factual and methodological bases for his opinion. His one-page written report does not offer any opinions about the cause of Mr. Aus' death, instead offering four summary opinions related to benzodiazepine withdrawal, a matter more squarely within his psychiatric expertise. At his deposition, Dr. Merrill offered clear insights regarding the medical reasoning—and the experience that informs it—by which he arrived at his opinions about severe benzodiazepine withdrawal and the likelihood that Mr. Aus' seizures were produced by that condition. By contrast, Dr. Merrill had a difficult time even articulating his death causation theory. Indeed, the clearest expression of a death causation opinion in Dr. Merrill's deposition was offered by plaintiffs' counsel in the form of leading questions that were adopted by Dr. Merrill with one-word affirmative responses. (ECF No. 85-3 at 46–47).

And finally, although defendants seek exclusion of Dr. Merrill's post-deposition affidavit for purposes of resolving the admissibility of his causation opinion, his affidavit, even if

considered, does not cure those defects. While it presents a more coherent and consistent theory than that advanced in the deposition, the affidavit is similarly devoid of any explanation of the materials or process used in arriving at his causation opinion. Thus, as with his initial report and deposition testimony, the affidavit provides no basis by which to adjudge whether his opinion is based on good grounds and is reliable. For all these reasons, Dr. Merrill's opinion as to the cause of Mr. Aus' death must be excluded.

But the exclusion of that opinion does not end the matter. Plaintiffs have set forth a highly plausible theory regarding the role of defendants' conduct in Mr. Aus' death. Plaintiffs have produced strong evidence establishing (1) that untreated benzodiazepine withdrawal presents a substantial risk of seizures; (2) that seizures and other severe benzodiazepine withdrawal symptoms are much more likely to occur in patients taking higher doses for longer periods of time; (3) that the risk of seizure for patients dependent on clonazepam would have been at or very near its peak when Mr. Aus seized;[27] and (4) that it is rare that someone Mr. Aus' age will experience acute hydrocephalus. While it is possible that the cyst with which Mr. Aus was born produced the hallmark symptom of severe benzodiazepine withdrawal (seizures) at precisely the time he was most at risk for that symptom, it is impossible to ignore the possibility that it was instead Mr. Aus' untreated benzodiazepine withdrawal that set off this chain of events.

---

[27] Some of defendants' briefing can be read as contesting whether Mr. Aus seized at all. But defendants' unwavering reliance on Dr. Grey—who himself concluded that Mr. Aus suffered seizures—forecloses any serious attack on that proposition. To the extent defendants intend to press this argument, the court concludes that there is ample evidence from which a jury could find that Mr. Aus suffered multiple seizures. Officer Lawrence and Mr. Aus' cellmate Jason Bane each described witnessing the physical manifestations of a seizure (indeed, they both characterized it as such contemporaneously and in interviews following Mr. Aus' death), and Dr. Grey testified that those witness accounts combined with an acute hemorrhage on Mr. Aus' tongue—indicative of bite marks—led to his conclusion that Mr. Aus experienced seizures.

Despite the strong logical inference flowing from this timeline, Mr. Aus' maladies, and the complex ways they interact, appear to be squarely in the domain of experts. Thus, the issue of death causation could not be permissibly submitted to the jury without reliable supporting expert testimony. At present, however, the scheduling order in this case precludes plaintiffs from securing a new expert to opine on the cause of Mr. Aus' death. Absent its modification, the scheduling order may effect a functionally outcome-determinative exclusion of evidence. In the absence of incurable prejudice to the defendants, the exclusion of possibly reliable—and plainly relevant—evidence regarding a central issue in this case would work an injustice. Thus, the court must consider whether to modify the scheduling order to permit plaintiffs to procure an expert who is qualified to opine on the relationship between Mr. Aus' severe benzodiazepine withdrawal and his death.

### 1. Whether the Scheduling Order Should be Modified to Permit the Addition of a New Expert

Under Rule 16(b)(4) of the Federal Rules of Civil Procedure, a scheduling order "may be modified only for good cause and with the judge's consent." A court considering whether to modify a scheduling order to permit the addition of a new expert witness is guided by four factors:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would . . . testif[y], (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order.

*Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1254 (10th Cir. 2011). The Tenth Circuit cautions that "a scheduling order can have an outcome-determinative effect on the case and [that] 'total inflexibility is undesirable.'" *Id.* (quoting *Summers v. Mo. Pac. R.R. Sys.*, 132 F.3d 599, 604

(10th Cir. 1997)). "A scheduling order which results in the exclusion of evidence is, moreover, 'a drastic sanction.'" *Id.* (quoting *Summers*, 132 F.3d at 1254).

The first, second, and third factors weigh heavily in favor of modifying the scheduling order here. The most salient fact bearing on these factors is that no trial is currently scheduled for this matter, and the court's unusually crowded criminal trial docket will preclude scheduling a trial to begin any earlier than February of 2020. As a result, there is "ample opportunity for [defendants] to test the opinions of the new expert witness, review the witness's reports, depose the new witness, and adequately defend against that expert at trial." *Id.* at 1255. Thus, defendants "would not be prejudiced by a new scheduling order in the sense of being unable to mount a defense against the new expert's testimony," which is "[t]he type of prejudice that rises to the level of warranting the exclusion of a witness's testimony." *Id.*

Moreover, while defendants were entitled to place some measure of reliance on the extant scheduling order, they would surely have been aware that the exclusion of expert testimony on one of the most important issues in this case might precipitate the addition of a new expert witness. *See Summers*, 132 F.3d at 605 ("Defendant could hardly have been surprised that plaintiffs would attempt to procure alternative expert testimony in the event the court granted defendant's motion to exclude [plaintiffs' expert witnesses].").

Additionally, as explained above, the exclusion of Dr. Merrill's death causation opinion does not entitle the Entity Defendants to summary judgment. Thus, whether or not the court amended the scheduling order to accommodate the addition of a new causation expert, the Entity Defendants will remain party to this case.

Finally, the fourth factor also weighs in favor of modifying the scheduling order in that the court can discern no bad faith or willful conduct attributable to plaintiffs. Plaintiffs

designated Dr. Merrill in a timely manner and there is nothing to suggest that they had reason to believe his testimony on the cause of Mr. Aus' death would be excluded. But this court has nevertheless concluded that he would testify so inconsistently that the court would find his testimony unreliable. Indeed, a district judge has considerable discretion in determining whether particular expert testimony is admissible under Rule 702. Under that rule, as the Tenth Circuit has noted, "'different courts relying on essentially the same science may reach different results,' but we could still affirm both decisions due to our 'deferential standard of review.'" *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016) (quoting *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1206 (10th Cir. 2002)). In short, there is nothing to suggest that plaintiffs *willfully* created the conditions requiring modification of the scheduling order.

Because there is no trial date set in this matter**,** the court finds that there is ample time to cure any minimal prejudice to defendants caused by a modification of the scheduling order. The court will therefore modify it to allow sufficient time to designate additional experts necessitated by the exclusion of Dr. Merrill's causation opinion.

## B. THE § 1983 DEFENDANTS' MOTION IN LIMINE

After setting aside opinions that the § 1983 Defendants seek to exclude that either do not correspond to the § 1983 claim or relate to death causation, the following opinions remain subject to their motion in limine:

> a.  Dr. Merrill's opinion that "[a] failure to follow the recommended taper protocol announced by the psychiatric care practices causes a patient to suffer an extremely high level of physical and emotional discomfort as well as a heightened risk of seizure and possible death."

b. "A change in mental status or seizure activity in a patient discontinued from benzodiazepines requires either a rescue dose of benzodiazepine or advanced care."

Dr. Merrill's expertise in the symptoms, complications, and treatment of benzodiazepine withdrawal cannot reasonably be challenged. He has spent 18 years observing and treating patients—mostly in a closed inpatient setting—suffering from benzodiazepine withdrawal syndrome. The opinions above are squarely in his ken, and their reliability is overwhelmingly established by independent medical authorities in the record. The record is replete with descriptions of untreated benzodiazepine withdrawal as causing "an extremely high level of physical and emotional discomfort as well as a heightened risk of seizure and possible death." And every single medical authority in the record forecloses the propriety of abrupt cessation of benzodiazepines for patients who are physiologically dependent. Finally, multiple record sources, like the Bureau of Prisons' guidelines, indicate that "[p]atients showing signs of late (severe) withdrawal [including delirium, changes in consciousness, and seizures] should be hospitalized." (ECF No. 94-10 at 16). Thus, Dr. Merrill's opinions on these matters, informed by highly relevant training and experience and corroborated by authoritative sources, are facially reliable and will not be excluded now or at trial.

## C. Wellcon's Motion in Limine

Aside from the death causation opinion, Wellcon seeks to exclude Dr. Merrill's opinions that (1) "Wellcon breached the applicable standard of care when providing care and treatment to Mr. Aus"; and (2) Mr. Aus' seizures were caused by benzodiazepine withdrawal. The court considers each in turn.

**1. Dr. Merrill's Standard of Care Opinion**

Wellcon contends that Dr. Merrill's dearth of experience working in correctional healthcare renders his opinions on the correctional standard of care unreliable. The court does not agree. Dr. Merrill's deposition testimony evinces that he took the time to ascertain whether there are differences in the standard of care in the context of the life-threatening condition of withdrawal from a high-dose, long-term benzodiazepine regimen. He could find none, an unsurprising result considering the concordance of medical authorities describing untreated benzodiazepine withdrawal as presenting unmitigable risks of seizures and death. It would be an untrustworthy source indeed that concludes that individuals may be abruptly taken off of long-term, high-dose benzodiazepine regimens by virtue of their carceral status.

And to the extent the correctional standard of care actually differs from the traditional standard of care, the record itself contains independent validations of Dr. Merrill's opinion as to the correctional standard of care. The Bureau of Prisons Clinical Practice Guidelines—developed, no doubt, to guide the delivery of healthcare in a correctional setting—states, without qualification, that "[b]ecause of the high risk of delirium, seizures, and death, benzodiazepine withdrawal should *always* be treated." (ECF No. 101-10 at 15) (emphasis added). That correctional guide further mandates a gradual taper for benzodiazepine-dependent inmates, forecloses the propriety of using CIWA scores for withdrawal monitoring, and warns that patients prescribed beta-blockers for hypertension require extra supervision because that class of medications masks indicators of severe benzodiazepine withdrawal. Indeed, aside from Wellcon's own *ipse dixit*, there is nothing in the record to suggest that the correctional standard of care for this condition is anything but what Dr. Merrill describes.

In sum, Dr. Merrill's opinions about the appropriate standard of care are entirely consistent with standards developed explicitly for custodial facilities. Thus, his relative

inexperience in that setting is of no moment. Moreover, Dr. Merrill has considerable experience treating patients in a closed environment—a state hospital with involuntary patients—not dissimilar from jails.

## 2. Dr. Merrill's Opinion that Mr. Aus' Seizures were Caused by Severe Benzodiazepine Withdrawal

Wellcon's general argument in seeking to exclude Dr. Merrill's opinion that Mr. Aus' seizures were caused by severe benzodiazepine withdrawal is that because Dr. Merrill conceded that acute hydrocephalus would also produce seizure activity, he is without a sufficient factual basis to opine that Mr. Aus' seizures were caused by benzodiazepine withdrawal. Wellcon further argues that Dr. Merrill's inability to point to any objective evidence that benzodiazepine withdrawal, rather than acute hydrocephalus, caused the seizures also requires the exclusion of this opinion. Again, the court disagrees.

Contrary to his death causation testimony, Dr. Merrill's deposition testimony regarding the relationship between Mr. Aus' withdrawal syndrome and his seizures was entirely consistent, and was premised on clearly articulated facts and reasoning borne from his extensive experience treating benzodiazepine withdrawal syndrome. Upon a careful review of his deposition testimony, it is clear that Dr. Merrill—explicitly relying on record evidence about Mr. Aus' symptomatic presentation—employed his experience, training, and specialization in this particular syndrome to reach his opinion that it was more likely than not that Mr. Aus seized multiple times due to severe benzodiazepine withdrawal. Contrary to Wellcon's argument, that process of reasoning and the experience that underlies it is reliable and will clearly assist the trier of fact to determine a fact in issue. Wellcon is, of course, free to vigorously cross-examine Dr. Merrill and argue to the jury that his opinion cannot be confirmed with 100% certainty by

observable phenomena, but this argument goes to the opinion's weight rather than its admissibility.

### D. REMAINING EVIDENCE SUBJECT TO THE § 1983 DEFENDANTS' MOTION TO STRIKE

The § 1983 Defendants[28] move to strike two exhibits appended to plaintiffs' memorandum in opposition to the § 1983 Defendants' motion for partial summary judgment: Exhibit H, an affidavit executed by Dr. Merrill, and Exhibit L, an audio recording of an interview conducted by plaintiffs' counsel of Mr. Aus' cellmate, Justin Bane. The court considers each in turn.

#### 1. Exhibit H

Exhibit H is an affidavit executed by Dr. Merrill that was submitted alongside plaintiffs' memoranda opposing the instant motions for summary judgment and motions in limine. Aside from Dr. Merrill's death causation opinion, which has already been excluded, the § 1983 Defendants take issue only with Dr. Merrill's correction of his deposition testimony regarding the time at which Mr. Aus would have been at the greatest risk of experiencing seizures and other severe withdrawal syndromes.

As an initial matter, in the expert context, the line between permissible—indeed, required—supplementation of expert opinions and prohibited untimely or wrongly withheld expert materials is a thin one. But Dr. Merrill's affidavit opinion regarding the timeline of

---

[28] Wellcon also filed a motion to strike Dr. Merrill's affidavit, but its argument in support is that Dr. Merrill's causation opinion renders it a sham affidavit designed to preclude summary judgment. Because Dr. Merrill's death causation opinion has been excluded, Wellcon's motion to strike is denied as moot.

withdrawal from clonazepam falls clearly into the category of permissible, and timely,[29] supplementation by virtue of its corrective character.

During Dr. Merrill's deposition, it appears that all participants erroneously believed that Mr. Aus seized and died on his eighth day at the Jail. Dr. Merrill testified that Mr. Aus would be most likely to experience peak withdrawal symptoms at that time due to the half-life of klonopin. Dr. Merrill seeks to correct that opinion, now stating that withdrawal from klonopin would have produced peak withdrawal symptoms on the tenth day of withdrawal, the earliest point at which all traces of klonopin would have been eliminated from his system.

While Dr. Merrill's inclination to provide testimony most supportive of his client's cause of action is perhaps unseemly—though indistinguishable from virtually every retained expert—the critical question is which of the two opinions is correct. Here, there is ample record evidence to support Dr. Merrill's corrected opinion that for a patient dependent on clonazepam—a benzodiazepine with a comparatively longer half-life—the peak withdrawal period, and therefore the height of seizure risk, arises between the seventh and fourteenth day after the patient's last dose. The court will not strike Dr. Merrill's accurate opinion to that effect merely because he once erroneously testified otherwise.

## 2. Exhibit L

Next, defendants seek to strike Exhibit L, an audio recording of an interview of Mr. Aus' cellmate Justin Bane conducted by plaintiffs' counsel. The parties appear to be litigating this issue under the dubious assumption that counsel's decision to conduct this interview after the close of fact discovery amounts to a discovery failure under Rule 37(c)(1) of the Federal Rules of

---

[29] Under Rule 26(e)(2), "additions or changes" to an expert's report and deposition testimony may be supplemented up to the time at which pretrial disclosures are due. Because no trial date has yet been set in this matter, Dr. Merrill's supplementation is obviously timely.

Civil Procedure. That rule provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

But defendants have not established that plaintiffs had an obligation—whether under the initial disclosure requirements or pursuant to defense-propounded discovery requests—to produce this information. Instead, defendants seem to believe that the close of fact discovery amounts to the bookending of the record; that only those materials and evidence exchanged during fact discovery may be used on summary judgment or at trial. The rules do not support this proposition, and defendants were as able as plaintiffs to find and interview Mr. Bane, an individual who would have appeared to any reasonably competent lawyer to be an important fact witness who was within none of the parties' control.[30]

In any event, the court need not rely on this interview for purposes of resolving the § 1983 Defendants' motion for summary judgment. Mr. Bane's observations of the relevant events are contained in myriad other materials in the summary judgment record, most prominently in documents chronicling the Jail's own post-mortem investigation. The court notes, however, that the interview will be freely admissible at trial provided it is not otherwise excludable under the Federal Rules of Evidence.[31]

## IV.    ORDER

For the reasons articulated, the court orders that:

---

[30] Moreover, it is clear from the record that the County already interviewed Mr. Bane when he was within its custody or control as an inmate at the Jail.

[31] The § 1983 Defendants further object that the interview is not supported by an affidavit or declaration by Mr. Bane. The court construes this objection as questioning the recording's authenticity. At trial, plaintiffs will, of course, be required to authenticate any evidence to which defendants, in good faith, assert an objection relating to authenticity.

1. The § 1983 Defendants' motion for summary judgment (ECF No. 82) is **DENIED.**

2. Wellcon's motion in limine (ECF No. 88) is **GRANTED IN PART AND DENIED IN PART.**

   a. Dr. Merrill's opinion as to the cause of Mr. Aus' death is excluded.

   b. In all other respects, Wellcon's motion in limine is denied.

3. Wellcon's motion for summary judgment (ECF No. 88) is **DENIED.**

4. The § 1983 Defendants' motion to strike (ECF No. 97) is **DENIED.**

5. Wellcon's motion to strike (ECF No. 104) is **DENIED AS MOOT.**

6. The § 1983 Defendants' motion in limine (ECF No. 85) is **GRANTED IN PART AND DENIED IN PART.**

   a. Dr. Merrill's opinion as to the cause of Mr. Aus' death is excluded.

   b. In all other respects, the § 1983 Defendants' motion in limine is denied.

7. The parties are **ORDERED** to meet and confer and, within 28 days of the date of this order, propose an amended scheduling order containing new deadlines for expert designation, expert discovery, and any motions seeking to exclude expert testimony.

Signed July 10, 2019

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge